We have five cases this morning, two from the Patent Office, PTAB, two from District Courts, one from the Court of Federal Claims, and that will be submitted on the briefs and therefore not be argued. Our first case is Daiichi Sankyo v. Accord Healthcare et al., 2017, 1052-1053. Mr. Brolin. Good morning, Your Honor. May it please the Court. The PTAB is required to abide by this Court's legal rules in deciding obviousness challenges. It did not do that here. This Court should correct the PTAB's misapplication of the law and reverse its findings of obviousness. I'd like to first start with the PTAB's motivation analysis. And what the PTAB did here is essentially... Daiichi... I'm sorry. Accord says Daiichi never argued that the labels teach away, only prior art taught away. How do you respond? That is incorrect. We argued it in our patent owner response. We set forth the standard for teaching away. And then on the very next page... So cite me to the record page now. Sure, absolutely. I think it's probably most clearly set forth in our reply where we point out... Record page. Sure. Appendix 322 through 324. And then in the appendix at 570, the Board itself acknowledges that we had made the argument by asking Mr. Lombardi, how do you balance that teaching with what patent owner would characterize as the teaching away in the labels? And Mr. Lombardi asked the question on the substance. And then later in the argument, Appendix 576, the Board again referred to the teach away argument and pointed counsel to the FDA labels. So I think it's clear that the argument was before the Board and the Board recognized that it was before the Board. I'm assuming it's not waived. And I understand your citation to Kinetic, but isn't teaching away something that's supposed to be considered in the context of all of the information available to one of Skill and the Art? I think that is true, Your Honor. Even if the labels are a data point that would suggest teaching away, can't that data point be offset by the additional information about how this was being prescribed and used on a regular basis? That is theoretically true, but that's not the analysis that the Board undertook. What the Board did in our reading is determine that the label was teaching away because they didn't contain a prohibition, and then interpreted the labels essentially as a teaching towards by saying they're an acknowledgment that the practice could be done, even though they say it's not recommended and you should do it with caution, and essentially saying it's a bad idea to do it. The Board never really took on the labels under the correct standard of teaching away. But even if the Board's analysis was a little sloppy on that, don't we have to look at the overall record to decide whether or not they actually amount to a teaching away? I certainly agree that you should look at the overall record. I think in the context of an appeal from the PTAB, it's not simply that you review judgments like you would from a district court. The agency must articulate its reasoning in a coherent and logical way to facilitate review, and this court has been clear recently that in the absence of the agency doing that, this court won't do it in the first instance. But I do take your larger point, which is why I think it's probably appropriate for me to segue to our larger motivation argument, because I think this plays into the teach away argument. And I think that's where most of our case law has been focused in terms of the failure to articulate is on motivation to combine. I think that's correct. I think it could come up in any context when the agency is insufficiently clear in its reasoning, but I think you are correct on that. And I think the fundamental error that the Board made on motivation was shifting the goalposts midway through the analysis. And let me tell you what I mean by that. Look, Mr. Perlman, this invention is almost anticipated. You've got Coniglio, which discloses a couple of these ADP receptor antagonists with aspirin, and Coniglio says, and the like, and the like includes Pressle-Grill. This is almost anticipated. Well, I disagree with that, Your Honor, because while Clopidogrel and Teclopidine and Pressle-Grill are all thionopyridines, they have very distinct differences, which is undisputed in the record. Pressle-Grill is much more potent than Clopidogrel and much, much more potent than Teclopidine. And what Coniglio says is, optionally, you may use aspirin in this combination of the thionopyridine and the not blindly say, well, because one is a thionopyridine, the next is a thionopyridine, but to consider whether it would be appropriate to use aspirin. But you're talking about motivation. Yes. Motivation to make improvements within a known area of possibility. Right. And I think the Board's own analysis shows its flaw, because they say the motivation to make the invention is to achieve increased efficacy, an increased effect on the platelet. It's undisputed that that same action also causes unwanted bleeding. It's the same platelet, not aggregating. And so it doesn't cause a blood clot. It also doesn't clot when you want it to. Then the Board acknowledged our argument that excessive bleeding would be a problem. And it didn't say, well, you'd plunge ahead. It said, no, no, you'd reduce the dose to account for that overall potency that existed in the prior art. The problem is the petitioner's own expert admitted that there was no scientific or medical need to have something that was just equal potent to the prior art, and also that that prior art was approaching a limit in terms of the efficacy that you could obtain, and that all you would do with increased potency is drive increased bleeding. And so what the Board essentially did is, in the second step of its motivation, came up with a theory that takes back the first part of their motivation. The idea that you would increase potency on the platelet by using Prasacryl, and then to avoid the bleeding that comes with it, pull back the dose so you don't get any more increased efficacy in order to avoid that bleeding, strikes us as circular. But didn't the Board talk about it as a comprehensive treatment and say that it's not just increased efficacy, but you need to make sure that both mechanisms of action occur? The Board said that, but it's two ways of saying the same thing, Your Honor. The reason to have two mechanisms of action is to get more action on the platelets. The reason to have, so you have the ADP receptors affect the platelets in one way, aspirin affects the platelets in another way, so you can get a greater overall effect on the platelet. But that same overall effect on the platelet is going to cause increased bleeding. And so the Board used a variety of different terms to make it sound like there were different arguments, but they're all really, they all get back to the same point. Dual action, comprehensive mechanism of action, increased efficacy, increased potency, they're all the same point. It's all getting an increased degree of inhibition at the platelet. And so I don't think that that is a separate reason in the Board's analysis. But weren't there other benefits, just not increased potency? Let me, and let me address each of those directly. The first, the Board said, was faster onset. But faster onset is the same double-edged sword as increased potency. You get faster effect on the platelet, so you could get faster efficacy, but you also would get faster bleeding. And so it's not really any different analysis. If you had to dial back the dose because of potency, you would have to likewise dial it back. What about the non-responder problem? Well, the non-responder problem, it was agreed, did not apply to Prasicril. That the prior art used aspirin because they had non-responders. Prasicril did not need aspirin because it didn't have non-responders. The final thing that the Board pointed to was that Prasicril would be less toxic than Clopidogrel. The problem with that is there was no known toxicity problem with Clopidogrel. The Board itself on page 18 cites Burnett as calling Clopidogrel not very toxic. And the petitioners never argued in the petition, in the reply, or an oral argument that less toxicity was a motivation, and the Board in its institution decision never mentioned it. This appears for the first time, unsupported by any record evidence, that a skilled artisan would think it was a motivation in the Board's final written decision. Let me take you back to teaching away. And I won't do the follow-up question I was going to ask because we moved too far away, although I didn't find your first answer entirely convincing. But you'd agree with me a reference doesn't teach away absent clear discouragement. I think that that is one component of this Court's standard. I think the Court has articulated it by saying if the reference would lead the artisan in a direction divergent from that that the inventor took, that that is a teaching away. You'd agree that there's plenty of authority that says if a reference merely cautions, a skilled person, that that's not teaching away? I don't agree that that is a legal rule. I agree that in the context of some factual scenarios, this Court has said, it doesn't really discourage you from going down that path. It tells you it's okay to go down that path, just be a little careful. But I don't think that's a legal rule. And I think in this case, you have one label that says putting them together is not recommended. And the second label says these are each going to cause bad bleeding. And so if you're going to do it, do it with caution. And the only expert evidence in the record is from our expert saying that would discourage you from combining these two agents. So I respectfully don't think it is a legal rule that a caution is insufficient and a prohibition is required. Now if I could segue, if there are no further questions on that, to the unexpected. There's, I suppose, a gradient between legal rule and stare decisis, but nevertheless, we have authority. I agree with you, Your Honor. But this Court has been very clear that you don't just decide obviousness by proxy, by reference to prior cases, that you look at the facts of each case. And that would be, I submit, the appropriate course here. Oh, I agree with you on that. Let me turn briefly to unexpected properties. The Board agreed with us that we had beneficial properties, that there was a nexus to the invention, but said, well, they're not unexpected because the hypothesis of the authors of the article published in 2006 said they expected it. But the priority date here is the year 2000. The record is... It's also a difference just in degree, isn't there? So that was going to be my second point. And I think that the Board legally erred in understanding what a difference in kind is. And the case I would point you to is your Allergan against Sandoz case. There are two in the record. This is the one at 796 in the F3rd. And the point there was you had a difference in the way two variables there, efficacy and the side effect, just like here, interacted with one another. The prior art gave an expectation that they would behave in a certain way that would be unbeneficial or neutral. And instead what happened with the invention is the efficacy remained and the side effect got better, which changed the prior understanding of how the variables interact. That's what we have here. The bleeding went up. The efficacy went up. But the prior art thought they should go up in parallel, that you have to take the bitter with the sweet. And what our study showed, by the way, published in the New England Journal of Medicine, which I think is some evidence that it is a significant finding, not some sort of minor run-of-the-mill thing. And then the FDA published their reasoning for approving the drug, also in the New England Journal of Medicine, a second indication. What our evidence showed is that the increase you got in efficacy outpaced the deleterious effect in bleeding, which was different than the prior art. And if there are no questions, I would like to reserve the balance of my time. We will do that, Mr. Perlman. Mr. Lombardi. Thank you, Your Honor. May it please the court. Substantial evidence supports the decision of the board here. And I would like to go, Judge Wallach, to your questions about teaching them away, because I think that's an attempt by the patent owner here to make a legal issue where I think there is none. It is waived. And the fact is that the language that the patent owner refers to here about caution versus prohibition and teaching away was in a section of the opinion that wasn't dealing with teaching away. Teaching away is dealt with at A18 and after. This was at A15, where the court is just discussing the prior art. That is because the patent owner never raised teaching away with respect to these two references, the labels. They did raise teaching away with respect to other references. That's conceded. But with respect to these two references, they never raised teaching away. And the references in the record. As I said, I didn't do my follow-up question. I understood, Your Honor. But so I do believe it's waived in its attempt to create a legal issue where there's none, where the board really wasn't addressing teaching away. I will, assuming we disagree with you on waiver, because maybe we will. Understood. I mean, when you do have a warning that it's actually dangerous to administer it, why wouldn't that be at least indicative of teaching away? Well, it's not in this instance, Your Honor, because of the art, because of this area. This is an area where there is inherent danger in any medication that would be used. And the board recognized this and it was conceded by all parties. We're talking about drugs that treat blood clotting. Blood clotting can be bad in some instances and it can be good in other instances. And so if you have a drug that treats blood clotting, it can have the beneficial effect, but it can also have the effect of prolonging bleeding. That's something that everybody in this art recognized. I think that's probably the very point that your opponent would make, which is we've already got the key component, the key drug itself, is going to be far more potent than the prior art. And so, therefore, adding the aspirin would dramatically increase the danger. So where in the record did the board make a finding that, in fact, there was some benefit, even any benefit, from the combination of the two? Well, they found two benefits, Your Honor. One, and to give you a precise citation, at A15, 17, and 21 to 22, the board talks about the two mechanisms of action, which Your Honor inquired about before. The two mechanisms of action here of aspirin and Prosegrel are significant, because while Prosegrel is very effective on its pathway, the pathway that it acts on, it has no effect on the other pathway, which is the pathway that the aspirin acts on. And so you are going to get an improvement. You would expect, at the time, the critical time in this case, to get an improvement by having drugs that operate on different pathways. The second was what Your Honor raised before, which is the board specifically found a motivation to combine based on the superiority of Prosegrel in other ways. And it specifically noted that it was, Prosegrel was less toxic than the prior art compound, Clopidogrel. It had a faster onset of action, and it had a longer duration of action. And that's at A17 and A22 of the board's decision. And so, Your Honor, there were two separate motivations to combine, which gave the person of skill in the art plenty of reason to go forward with the combination of Prosegrel and aspirin. And I should note as well, while there has been talk on the part of my colleague that Prosegrel had maxed out in terms of efficacy, there's no evidence of that. That is an argument that's being made, but there's no citation. There's nothing, no prior art that indicates that there was a sense or a sentiment that Prosegrel had reached the maximum in terms of efficacy. That's just not in the record. So your response to your friend's argument that Prosegrel, that the art taught that the free base Prosegrel was already bioavailable and potent and had sufficient efficacy, that therefore, there would have been no motivation to use the salt form. What is your response to that? Well, the motivation to use the salt form, and the board found this, is essentially the same as the motivation to use the free base form. The only thing I can see in the board's ruling on that is that they said, is that persons of ordinary skill would have known that hydrochloric salt of Prosegrel may be used in a pharmaceutical formation. I mean, I don't know that that's enough, is it? Well, your honor, that's at 823, and I think if you consider the opinion as a whole, the decision as a whole, the context is clear, and the path of the board to that decision of obviousness on the salt is clear. First, the board considered obviousness with respect to Prosegrel as a whole, in the opinion, up until that point in the opinion. Then when it got to that point in the opinion, the only new question was, is there something about Prosegrel itself that would work? Because the motivation is the same for Prosegrel, the free base, and Prosegrel, the salt. And so when you get to the salt portion, rather than repeating everything that it had previously said about Prosegrel in general, it then cut to what was the important issue with Prosegrel, the salt. Was there something that taught that it could be useful in pharmaceutically acceptable, and that it could be useful for therapeutic purposes? And it did do that, your honor. The Coyke reference is the one that the board cited to at 823, and the Coyke reference at A1001, column 39, lines 30 to 34, specifically stated that the hydrochloride salt of Prosegrel can be used in anti-aggregation therapy. So the most- Well, salts are obvious in the extreme, and pharmaceuticals and hydrochlorides are the first ones you go to. I agree, your honor. But how about unexpected properties? Yes, well, the unexpected properties, your honor, in this instance, the properties that were proved in the Triton study, which is the study that my colleague points to as demonstrating unexpected results, are exactly the results that one would have expected at the time, at the critical time in 2000. That is, that Prosegrel would have increased efficacy, and Prosegrel and aspirin would have increased efficacy, and Prosegrel and aspirin would have increased bleeding. That's precisely what the Triton study found. The Triton study in the abstract, and then in the concluding paragraph, specifically states that Prosegrel was found to have increased efficacy over Clopidogrel and aspirin, and increased bleeding over Clopidogrel. I don't know if this is in the record or not, but is there any combination where you have increased efficacy that doesn't have increased bleeding? In the element, the art that's in the record, I don't think there's any that says the contrary. And it's certainly the case for Clopidogrel. But the significant point for unexpected results, your honor, is that for Clopidogrel and aspirin, it had increased, it had efficacy and it had bleeding. Prosegrel, just as expected, had increased efficacy and increased bleeding. So doesn't that indicate that you wouldn't combine the two? No, well, no, your honor. That it would be fine on its own? No, well, because Prosegrel was a superior thionopyridine. What we go back to at the first part of our case about motivation to combine is that it was taught in the art that thionopyridines were useful when combined with aspirin in treating blood clotting. That's what the art showed. So you started with clopidine. Then you went to Clopidogrel. And then you went to a superior- Well, is this really just an obvious to try argument because people used it before? Well, I guess you could frame it as an obvious to try argument. But really what it is, is it's an argument that the art taught that thionopyridines together with aspirin would be effective. Thionopyridines came, there was a new thionopyridine that came out, Prosegrel, it was superior. It was the third one in its class that came out. It was determined that it had greater efficacy. It was determined that it was better in the other ways that your honor has pointed out before. It was obvious and there was a motivation to combine those two. In addition- The problem with all of this is in the word you use, the art taught. It's an art. And at the pointy end of the spear, there's always a medical person who is balancing those needs and dangers. And my take on those labels is saying to that person, be aware, you're going to have to make this decision based on where the patient is. Yes, and I think that's exactly right. That is what the label is saying. That's why the label is a caution. The fact that it uses the term caution is an indication that people were actually using it. And to your point, your honor, the person of skill in the art, it was found and it was actually agreed by all parties, would know how to do the balancing. That was, there's no dosage claimed here. There's no particular efficacy claimed here. And a person of skill in the art would know how to do the balancing in this case in order to meet what was termed by one of the experts the sweet spot between bleeding and efficacy in the way that this was prescribed. And that's why I think your honor may have been alluding to, could there have been a reasonable expectation of success given that this is an art? And yes, there could have been and the board found that when it found that the person of skill in the art could find that sweet spot through normal testing and use of the disresponse curve. So, your honor, I would just go back to a couple of points that were mentioned before in my colleague's argument. The teaching in the art about the combination, coniglio in particular, your honor, which Judge Lurie, you mentioned, was very express in terms of the ability to use aspirin with Prazegrel. Coniglio specifically talked about Clopidogrel, Ticlopidine, and the like. But did the board make a finding that said that the pre-based forms of these three things were all the same? They weren't all the same, your honor. They were different. They had different qualities. And in fact, that's one of the reasons why you, I'm sorry, your honor. Isn't that your opponent's point? No, well. You can't just say because it worked with X, it's going to work with Y. No, you can't. And you can't say for sure, your honor, but absolute predictability is never a requirement. And obviously. You do have to have a reasonable expectation. And you do have a reasonable expectation here for a number of reasons, your honor. But it worked, the combination worked with Ticlopidine and aspirin. It worked with Clopidogrel and aspirin. Those were the thionopyridines that were of record in the art. It was taught in Bernat to connect those, to combine those. It was taught in Coniglio to combine those. And when a better thionopyridine, a better thionopyridine, in this case, Prozogrel, comes up, then it is taught. There is a motivation to combine. There's a reasonable expectation of success. The reason that was offered for there not being a reasonable expectation of success in this instance was a bleeding risk. That was what was offered. But the board considered and found, as I was just mentioning in response to Judge Wallach's question, the board was considering and found that a person of skill in the art would have recognized that there's that kind of bleeding risk, but would have known how to deal with that bleeding risk because there's a dose-response relationship. The Assay reference specifically talks about a dose-response relationship between bleeding and efficacy with respect to Prozogrel. The real question is, did the board actually make those findings? Are those just the arguments that you made? No, the board did make those findings. The board specifically talked about the, this is at the teaching, excuse me, this is at A20 where the board is talking about the reasonable expectation. It specifically relied on Hirsch, our expert, citing A1924, paragraph 76, where the person of skill in the art, Hirsch said that the person of skill in the art would have known to adjust the dose of Prozogrel to mitigate the potential for any additional bleeding risk. That was taught, that was testified to by our expert. And in fact, that point wasn't contested at trial. So the board had substantial evidence to support the conclusion that a person of skill in the art would be able to have a reasonable expectation of success because they were able to adjust the bleeding and efficacy endpoints that were in question here. Can you just respond to your friend on the other side with respect to his unexpected results argument that he said this is not really a difference in degree, it's a difference in kind? I think it is a difference. It's not a difference in kind. The difference in kind would be if Prozogrel and aspirin created a new property that hadn't existed in the prior art. The properties of Prozogrel that we're talking about here are precisely the same as existed in the prior art. We talked about efficacy and bleeding with Clopidogrel. That's what we're talking about with Prozogrel when we're talking about the unexpected results. We're talking about bleeding and we're talking about efficacy. When there's a discussion of net clinical benefit, that's just a ratio of those two points, bleeding and efficacy. And so, the court concluded as the evidence showed, you would have expected more bleeding and more efficacy from Prozogrel and in the Triton study, that's exactly what you got. That was what you got. There was nothing unexpected whatsoever. Now, to the extent there was any difference, it was a difference in degree, Your Honor, because the only thing that my colleague is complaining about is that the bleeding risk, while more for Prozogrel and aspirin than for Clopidogrel and aspirin, was not as much as one might have expected. But that's a difference in degree because the Prozogrel and aspirin combination still caused more bleeding than the prior art, still had greater efficacy than the prior art. Mr. Lombardo, you might see that your red light is on. I do. Thank you, Your Honor. Mr. Perlman has some rebuttal time, three and a half minutes. Thank you, Your Honor. I'll add a couple of points. I want to clear up a little confusion. The point I made was not that Prozogrel had maxed out the potency. The point I made was that the art taught that the combination of Clopidogrel and aspirin was reaching a limit in terms of the efficacy that could be achieved. Their experts said that at A2713. Our experts said that at A3010. Second point, on the issue that the board pointed to, that people were using Clopidogrel and aspirin despite the labels, the board stopped reading in the same paragraph that they cited our expert where he said, but Clopidogrel and aspirin were having problems. There was a lot of bleeding. And the very next paragraph quotes the guidelines that say, and the efficacy of it was still unclear. And our expert said, in the very passage the board is quoting, that that wouldn't have provided a foundation to use the even more potent Prozogrel with aspirin, which gets me to the labels. The point is not whether the labels teach away from Clopidogrel and aspirin by giving your caution. The point is, given this caution in the label, would you be dissuaded from using the 10 times more potent Prozogrel with aspirin when Prozogrel didn't need it and when the Clopidogrel and aspirin combination was reaching the limit of efficacy? But isn't the question of what to use one for the physician? Well, the question here is combining these old products and whether the combination produces unexpected properties. Well, I think there are two questions. I think the board's circular motivation shows that the skilled artisan wouldn't want to have combined them. But if they did, the expectation would have been that bleeding and efficacy would rise and fall together. And here they didn't. And that's significant. And just to quibble with Mr. Lombardi, in Allergan, the two properties involved whose relationship to each other change, were both known properties. They were the efficacy of the drug and a known side effect of the drug. And that didn't prevent it from being a difference in kind. And let me use my final 26 seconds to make a point on the salt claims. And Judge Lurie, the issue here is not which salt. The issue is, do you use a salt at all? And the reason this is different from the typical case, is this drug had already reached phase one clinical trials with the freebase. All the prior art anyone cites is the freebase. The evidence is that the freebase is sufficient and desirable to use as a drug. And the board offered no reason whatsoever to switch at that point to the hydrochloric salt. I see my time has elapsed. Thank you, Mr. Truman. We'll take the case on the right.